2024 IL App (1st) 231312-U

FIRST DISTRICT,
SIXTH DIVISION
December 20, 2024

No. 1-23-1312

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| GEORGE SIANIS and SPYRIDON THEODORAKIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiffs-Appellees, | ) | |
| v. | ) ) | No. 2021 L 004661 |
| ASIF SAYEED and VITAL HOME & HEALTHCARE, INC., | ) ) ) | Honorable Patrick J. Sherlock, |
| Defendants-Appellants. | ) ) | Judge Presiding. |

JUSTICE GAMRATH delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) We lack jurisdiction to review defendant's challenge to the dismissal of his affirmative defense of laches where it was not referenced in his notice of appeal and was otherwise waived. (2) One-year refiling limit for voluntarily dismissed claims under section 13-217 of the Code of Civil Procedure does not apply to claims that are reasserted after a cause is reversed and remanded on appeal. (3) Trial court's judgment against defendant for breaches of fiduciary duty and its computation of damages is not against the manifest weight of the evidence.

¶ 2    Plaintiffs George Sianis and Spyridon Theodorakis, shareholders of Vital Home & Healthcare, Inc. (Vital), sued Vital's president, Asif Sayeed, alleging numerous breaches of fiduciary duty. Following a bench trial, the trial court entered judgment for plaintiffs on their claims for dilution of shares, two counts of usurpation of corporate opportunities, and breach of fiduciary duty of loyalty based on Sayeed's self-interested loans from Vital to entities owned by him, his wife, or his relatives. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Vital is an Illinois corporation that provides home healthcare services. Prior to 1997, plaintiffs were directors and sole shareholders of Vital. They managed Vital's finances and the care of Vital's patients. In 1997, they collectively sold 90% of Vital's shares to First American Group of Companies (FAGOC). Plaintiffs each retained 50 shares, or a 5% share in Vital. After the sale, Vital did not consult with plaintiffs as directors. Plaintiffs stopped performing work for Vital and had no further involvement with the company, except that Theodorakis attended one meeting.

¶ 5    FAGOC was a holding company wholly owned by Sayeed. In 2000, FAGOC was dissolved, and Sayeed allegedly acquired FAGOC's 90% share in Vital. Additionally, in 2000, Sayeed became the president of Vital and appointed Asim Farooqi as the secretary of Vital.

¶ 6            A. Facts Relating to Plaintiffs' Claim for Dilution of Shares

¶ 7    On June 19, 2003, counsel for Vital sent a letter to plaintiffs asserting that Sayeed "was forced to" make a capital contribution of $942,907 to Vital "[s]o that Vital Home could remain as a viable and functioning entity during the past year." The letter gave plaintiffs two options: either each of them could "reimburse Mr. Sayeed the amount of $47,145.35 for a total of $94,290.70," or a special shareholders meeting would be held "for purposes of issuing additional

shares of Vital Home stock, which will serve as compensation for Mr. Sayeed's capital contribution."

¶ 8 Plaintiffs did not pay Sayeed the requested monies. On September 4, 2003, a special meeting of Vital's shareholders was held at which Sayeed purported to issue himself 235,227 shares of Vital.

¶ 9 Sayeed admitted at trial that Vital was "very profitable" in 2003 and did not need a capital contribution of $942,907 in the one-year period ending June 19, 2003. He also admitted that he did not personally give Vital $942,907 during that period, although he stated that FAGOC gave $942,907 to Vital "over a period of three years, upon [his] direction."

¶ 10 B. Facts Relating to Advanced Home Health Care, Inc.

¶ 11 Vital used to provide home healthcare services in Indiana, but it stopped in 2012 upon receiving a cease-and-desist letter from the Indiana Department of Health. Farooqi explained at trial that "since Vital is an Illinois operation, [it] cannot work with Medicare in Indiana since 2012."

¶ 12 In or around November 2012, Sayeed purchased Advanced Home Health Care, Inc. (Advanced), an Indiana business that provides home healthcare services in Indiana – the same business as Vital. Sayeed chose not to have Vital set up a subsidiary holding company to acquire Advanced or make other legal arrangements to continue providing home healthcare services in Indiana. There was conflicting testimony at trial as to why this was not attempted. Sayeed testified that acquiring Advanced would have been "too risky" for Vital and that he wanted "to keep [Advanced] away from Vital" so that "if [Advanced] gets into trouble, Vital is still healthy." Farooqi, on the other hand, testified that "[t]he only reason that Vital did not attempt to set up a holding company to purchase Advanced was that it would have taken longer."

¶ 13    After Sayeed purchased Advanced, Farooqi began working for Advanced with the same job title and job duties that he has with Vital, and some of Vital's Indiana employees continued to work in Indiana for Advanced. From 2013 through 2020, Advanced reported net income of $308,881. Advanced's business was negatively impacted by the COVID-19 pandemic, and sometime in or after 2020, Sayeed made the decision to close the company.

¶ 14                    C. Facts Relating to Vital's Offices

¶ 15    Prior to 2005, Vital's offices were located at 16335 South Harlem in Tinley Park, Illinois, in a building owned by plaintiffs, and Vital paid annual rent of $69,502. On or around March 22, 2005, Sayeed purchased property at 8051 West 86th Street in Tinley Park ("Real Estate") without first informing Vital that it was available for purchase. Sayeed then moved Vital's offices to the Real Estate and set the annual rent at $152,127.84, an amount he determined without an appraisal of the fair market rental value of the property.

¶ 16    Although Vital's lease is for the entire premises located at the Real Estate, Vital does not use the entire premises. Instead, parts of the premises are used by these other entities owned by Sayeed, his wife, or his relatives:

- Physician Care Services, S.C. (PCS), a company incorporated by Sayeed and owned by Sayeed's nephew-in-law and niece, uses one of the four units located at the Real Estate;

- First Encore, Inc., a medical transportation company owned by Sayeed's wife, uses the Real Estate as its mailing address, and Farooqi performs work for First Encore at the Real Estate; and

- Management Principles, Inc. (MPI), a healthcare management company of which Sayeed is the majority shareholder and president, has its office at the Real Estate.

¶ 17 Sayeed's tax returns from 2011 through 2020 show he received $1,468,234 in income from the Real Estate during that period. After subtracting expenses, including mortgage interest, he received $889,730 in profits. Additionally, since he purchased the Real Estate, its value has appreciated from the original purchase price of $995,000 to $1,237,200.

¶ 18 D. Facts Relating to Loans That Vital Made to Other Companies

¶ 19 Vital made loans to the following companies owned by or affiliated with Sayeed: Advanced, PCS, First Encore, MPI, Lifecore Rehabilitation & Counseling Services, S.C. of which Sayeed is the majority shareholder, and Smart Medical Buildings, LLC, which is wholly owned by Sayeed.

¶ 20 Plaintiffs retained Ralph Picker, a certified public accountant, to perform a forensic fraud investigation in which he "consider[ed] and analyze[d] whether Mr. Sayeed used his executive position to conduct improper transactions through Vital and through his affiliated entities." Picker testified at trial that Vital's internal financial statements did not balance and were not prepared in accordance with generally accepted accounting principles. They had unexplained entries that were not part of recognized accounting terminology and placeholders that were never replaced.

¶ 21 Regarding the loans made from Vital to other entities, Picker testified that the loans were "not authorized," were made without any loan agreements, collateral, or interest, and were not repaid. At the end of 2020, the loans totaled at least $1,228,531. However, Picker additionally noted that there were inconsistencies in the loan reporting. Vital's internal records reflected that MPI owed it $495,000, while MPI's records reflected that it owed Vital $2,014,000. This $1.5 million discrepancy persisted from year to year, and Picker was unable to reconcile the numbers.

Picker's minimum loans calculation of $1,228,531 did not factor in this $1.5 million discrepancy.

¶ 22    Picker concluded that he had "major, major concerns that a fraud was committed" based on "a combination of excessive management fees, salaries, rents, and substantial loans to related parties, and all the other statistical information [he] had reported in [his] report."

¶ 23                                    E. Procedural History

¶ 24    On June 13, 2014, plaintiffs filed their initial complaint against Sayeed and Vital, seeking to compel examination of corporate records and an equitable accounting. On March 7, 2017, they filed a third amended complaint alleging various breaches of fiduciary duty including dilution of shares. On April 2, 2019, Sayeed filed an affirmative defense of laches.

¶ 25    On July 10, 2019, the trial court entered an order dismissing Sayeed's affirmative defense of laches pursuant to section 2-615 of the Code of Civil Procedure. 735 ILCS 5/2-615 (West 2018). The court also entered partial summary judgment against plaintiffs on their claim for dilution of shares, which it found to be time-barred. On July 12, 2019, the trial court granted plaintiffs' motion to voluntarily dismiss all remaining claims in their third amended complaint without prejudice to refiling.

¶ 26    On December 22, 2020, this court reversed the portion of the trial court's July 10, 2019, order that granted summary judgment against plaintiffs on their claim for dilution of shares, finding that Sayeed waived his statute of limitations defense. *Sianis v. Sayeed*, 2020 IL App (1st) 191777-U. The cause was remanded for further proceedings. On August 18, 2021, plaintiffs moved for leave to file a fourth amended complaint "to reassert the claims that were voluntarily dismissed without prejudice on July 12, 2019 and to add additional factual allegations

ascertained through discovery." The court held a hearing on November 8, 2021, and plaintiffs filed their fourth amended complaint later that day.

¶ 27    The fourth amended complaint contains eight counts, of which counts I, IV, VI, and VIII are at issue in this appeal. In count I, breach of fiduciary duty for dilution of shares, plaintiffs allege Sayeed breached his fiduciary duty to Vital by issuing 235,727 shares of Vital to himself, "thereby attempting to dilute Plaintiffs' 10% interest in Vital to almost nothing," despite not making any capital contributions to Vital in 2002 or 2003. Counts IV and VI both allege breaches of fiduciary duty for usurpation of corporate opportunity. In count IV, plaintiffs allege Sayeed purchased Advanced for himself without first tendering the opportunity to Vital. In count VI, plaintiffs allege Sayeed purchased the Real Estate, charged "unfair rent" to Vital, and rented portions of the Real Estate to other entities that he owned and personally profited therefrom without compensating Vital. Count VIII alleges Sayeed breached his fiduciary duty to Vital by loaning money from Vital to companies owned by himself, his wife, or his relatives in "undocumented" loans for which Vital received no interest.

¶ 28    Following a bench trial, the trial court found in plaintiffs' favor on counts I, IV, VI, and VIII of the fourth amended complaint. Regarding count VIII, the trial court found that "[w]ithout any loan agreement, collateral or interest, Vital improperly loaned entities owned by or related to Asif Sayeed $2,737,373.74, which loans are still outstanding." The court additionally found that the loans were "manifestly unfair" and concluded that "fraud has occurred with respect to Vital." The court found in favor of Sayeed on all remaining counts, which are not at issue in this appeal. After further proceedings relating to calculation of damages, the trial court entered its final judgment against Sayeed on June 29, 2023.

¶ 29                                   II. ANALYSIS

¶ 30        On appeal, Sayeed argues the trial court erred in (1) granting plaintiffs leave to amend their complaint to reassert the claims that were voluntarily dismissed; (2) dismissing Sayeed's affirmative defense of laches; (3) calculating the damages caused by Vital's loans to companies affiliated with Sayeed; (4) finding that Sayeed's purchase of Advanced constituted usurpation of a corporate opportunity; and (5) finding that Sayeed's purchase of the Real Estate constituted usurpation of a corporate opportunity, or, in the alternative, computing the damages that resulted therefrom. We consider these claims in turn.

¶ 31                              A. Appellate Jurisdiction

¶ 32        Initially, plaintiffs argue that we lack appellate jurisdiction over Sayeed's contentions of error regarding (1) the trial court's November 8, 2021, order granting plaintiffs leave to amend their complaint to reassert claims that were voluntarily dismissed and (2) the trial court's July 10, 2019, order dismissing his affirmative defense of laches, because neither order was referenced in Sayeed's notice of appeal. Sayeed's notice states only that he is appealing from "the June 29, 2023, final judgment order of the Circuit Court of Cook County in the captioned cause, disposing of all post-trial motions regarding Counts I, IV, VI, and VIII of the amended complaint tried by the Circuit Court without a jury."

¶ 33        The filing of a notice of appeal is the jurisdictional step which initiates appellate review. *In re Estate of York*, 2015 IL App (1st) 132830, ¶ 32. Under Supreme Court Rule 303(b)(2) (eff. July 1, 2017), the notice of appeal must "specify the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court." An appeal from a final judgment order entails review of that order as well as any interlocutory order that was a " 'step in the procedural progression leading' to the judgment specified in the notice of appeal." *U.S. Bank*

*Nat'l Ass'n v. Luckett*, 2013 IL App (1st) 113678, ¶ 13 (quoting *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 434-35 (1979)).

¶ 34 Our supreme court applied this principle in *Burtell*, 76 Ill. 2d at 435-36, to find that a notice of appeal referring only to a final judgment order also confers jurisdiction to review a prior order for an accounting on which the final judgment was based. Similarly, in *Smock v. Hale*, 197 Ill. App. 3d 732, 738 (1990), we had jurisdiction to review unspecified orders disqualifying plaintiff's medical expert and closing the discovery schedule, since they "directly contributed" to the summary judgment specified in the notice of appeal.

¶ 35 However, in *McGath v. Price*, 342 Ill. App. 3d 19, 34 (2003), a notice of appeal referencing an order granting summary judgment on plaintiff's negligent entrustment claim was not sufficient to grant jurisdiction to review an order granting summary judgment on plaintiff's vicarious liability claim, since the two orders dealt with "totally different subject matters and claims." Likewise, in *Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.*, 78 Ill. 2d 56, 61 (1979), where the notice of appeal listed only a summary judgment order and not an earlier order dismissing a counterclaim, the court lacked jurisdiction to review the propriety of the dismissal.

¶ 36 Here, we have jurisdiction to review the trial court's November 8, 2021, order granting plaintiffs leave to reassert the dismissed claims of their complaint, since that order "directly contributed" to the court's judgment for plaintiffs on counts IV, VI, and VIII of that complaint. See *Smock*, 197 Ill. App. 3d at 738. Given the interrelationship between these orders, the unspecified order is clearly a step in the procedural progression leading to the court's final judgment. See *Luckett*, 2013 IL App (1st) 113678, ¶ 13.

¶ 37 However, we lack jurisdiction to review the July 10, 2019, order dismissing Sayeed's affirmative defense of laches. Sayeed pleaded laches in opposition to the third amended

complaint, not the fourth amended complaint, which resulted in the June 29, 2023, final judgment. An order pertaining to a prior pleading that was superseded by amendment cannot be considered a step in the procedural progression. What's more, Sayeed answered the fourth amended complaint on December 6, 2021, and asserted four affirmative defenses. Laches was not one of them. By not raising laches as an affirmative defense or even referring to it, Sayeed waived his right to appellate review. See *Larkin v. Sanelli*, 213 Ill. App. 3d 597, 601-602 (1991) (defendant waived appellate review of affirmative defense that was stricken and not repleaded).

¶ 38                    B. Plaintiffs' Fourth Amended Complaint

¶ 39        Sayeed raises multiple contentions of error related to the trial court's order granting plaintiffs leave to file a fourth amended complaint and reassert the dismissed claims of their third amended complaint after remand.

¶ 40        First, Sayeed argues that plaintiffs' motion to amend their complaint was untimely under section 13-217 of the Code of Civil Procedure, which provides that if an action is voluntarily dismissed by plaintiffs, plaintiffs "may commence a new action within one year or within the remaining period of limitation, whichever is greater." 735 ILCS 5/13-217 (West 1994).[1]

¶ 41        We find the one-year limitation in section 13-217 is inapplicable because plaintiffs were not "commenc[ing] a new action" under that section. Plaintiffs' third amended complaint was a one-count complaint with a myriad of claims scattered throughout. After the court entered partial summary judgment for Sayeed, plaintiffs voluntarily dismissed the remaining claims without prejudice to refiling. This made the July 10, 2019, order final and appealable. On appeal, we reversed the grant of summary judgment and remanded for further proceedings. *Sianis*, 2020 IL

---

[1] Section 13-217 was amended in 1993 to remove voluntary dismissals from its ambit (Pub. Act 89–7, sec. 15, eff. March 9, 1995 (amending 735 ILCS 5/13–217 (West 1993)). However, the amendatory act was held unconstitutional in *Best v. Taylor Machine Works*, 179 Ill. 2d 367 (1997).

App (1st) 191777-U. Our remand gave the trial court the opportunity to revisit all aspects of the case, including plaintiffs' motion for leave to amend the complaint, add new counts, and reassert claims.

¶ 42     The remand of a case following an appeal represents a continuation of the original action, not a new one. See *One Fish Two Fish, LLC v. Struiff*, 2021 IL App (1st) 191441, ¶ 37, citing *National Underground Construction Co. v. E.A. Cox Co.*, 273 Ill. App. 3d 830, 834 (1995) (holding section 13-217 does not pertain to remands and reinstatement of a case after remand does not constitute the filing of a new action). "[T]hus, by its own terms, section 13-217 does not apply." *One Fish Two Fish, LLC*, 2021 IL App (1st) 191441, ¶ 39. *Eighner v. Tiernan*, 2021 IL 126101, ¶¶ 21, 25, makes this clear, holding that a "new action" under section 13-217 denotes a new complaint, with a new case number, a new filing fee, and a new summons – none of which we have here.

¶ 43     *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, upon which Sayeed relies, does not support his argument. In *Richter,* the court held a refiled action pursuant to section 13-217 is not a restatement of the old action, but an entirely new and separate action. *Id.* ¶ 48. This is consistent with our view that a case remanded on appeal is not a new action and, therefore, section 13-217 does not apply. *Suslick v. Rothschild Securities Corp.*, 128 Ill. 2d 314 (1989), also cited by Sayeed, is similarly distinguishable, since it involves the filing of a new action rather than an action reinstated upon remand. In fact, Sayeed does not cite any cases holding that section 13-217 applies to the situation at hand. Accordingly, we reject his argument that plaintiffs' motion to file the fourth amended complaint was untimely under section 13-217.

¶ 44     Second, Sayeed argues that plaintiffs' reassertion of their claims is barred by *res judicata*. "Under the doctrine of *res judicata*, a final judgment rendered on the merits by a court of

competent jurisdiction is conclusive as to the rights of the parties and their privies and, as to them, constitutes an absolute bar to a subsequent action involving the same claim, demand, or cause of action." *Torcasso v. Standard Outdoor Sales, Inc.*, 157 Ill. 2d 484, 490 (1993). Where there is identity of parties, subject matter, and cause of action, *res judicata* extends to every matter determined in the prior suit as well as every other matter that might have been raised and determined. *Id.* However, *res judicata* requires a judgment on the merits. *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 41.

¶ 45        Here, no final judgment had been rendered at the time plaintiffs moved to amend their complaint. Nor was there a subsequent action filed. Prior to the first appeal, the claims raised in plaintiffs' third amended complaint were dismissed without prejudice to refiling. On appeal, we reversed partial summary judgment for defendant and remanded the case for further proceedings. This allowed the trial court to pick up where it left off and consider all motions presented, including plaintiffs' motion for leave to file the fourth amended complaint. At this juncture, allowing leave to amend was wholly within the trial court's discretion, and the court did so liberally in accordance with section 2-616 of the Code of Civil Procedure (735 ILCS 5/2-616 (West 2020)). We see no reason to reverse.

¶ 46        Third, Sayeed argues that granting leave for plaintiffs to amend their complaint was improper under *Ward v. Decatur Memorial Hospital*, 2019 IL 123937, ¶ 31, which he cites for the proposition that under Supreme Court Rule 219(e) (eff. July 1, 2002), "[a] party shall not be permitted to avoid compliance with discovery deadlines, orders or applicable rules by voluntarily dismissing the lawsuit." He asserts that plaintiffs voluntarily dismissed their claims because "the recovery would not have been what [they] wanted" and they "did not want to go to trial as the trial court required." However, Sayeed provides no record citations for these assertions, he did

not argue this below, and he fails to support this point with coherent legal argument on appeal. We deem this argument forfeited and find no abuse of discretion in the court allowing plaintiffs' leave to amend and reassert claims that were voluntarily dismissed without prejudice to refiling. See *People ex rel. Madigan v. Lincoln, Ltd.*, 383 Ill. App. 3d 198, 208 (2008) (appellant forfeited argument where it merely stated a proposition but made no attempt to support it with analysis or authority).

¶ 47                    3. Damage Computation Regarding Vital's Loans

¶ 48        Sayeed next argues that the court erred in calculating the amount of Vital's outstanding loans and that he is entitled to "a deduction of $1.5 million from the judgment amount."

¶ 49        "Where an award of damages is made after a bench trial, the standard of review is whether the trial court's judgment is against the manifest weight of the evidence." *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191, ¶ 13. Under this standard, we will not overturn a damage award unless the trial court ignored the evidence, or its measure of damages was erroneous as a matter of law. *Id.*

¶ 50        Here, there was conflicting evidence at trial as to the amount that Vital was owed. Picker testified that the outstanding loans totaled $1,228,531 "at minimum," but he also observed a discrepancy of approximately $1.5 million between Vital's financial statements and MPI's statements as to how much MPI owed Vital. Sayeed argues that the trial court should have relied on Vital's statements in determining the damages to be awarded. We disagree. Considering Picker's testimony that Vital's financial statements did not conform to generally accepted accounting principles and contained numerous inconsistencies, unexplained entries, and placeholder entries, it was reasonable for the court to rely on MPI's financial statements.

¶ 51　　　　Sayeed additionally argues there was no evidence to support the court's conclusion that the $1.5 million discrepancy was due to loans rather than "a valid charge to Vital." However, when a corporate fiduciary commingles corporate assets with non-corporate assets, "he has the burden of untangling the mess." *Graham v. Mimms*, 111 Ill. App. 3d 751, 766 (1982). In *Graham*, defendant breached his fiduciary duty of loyalty by using corporate funds to investigate and develop various projects. Defendant nevertheless argued that plaintiffs failed to prove which of the projects were developed with corporate funds. We rejected this argument, citing the principle that "[t]he burden of producing evidence, chiefly, if not entirely, within the control of an adverse party, rests upon such party if he would deny the existence of claimed facts." (Internal quotation marks omitted.) *Id.* at 767. Under the circumstances, we found that "only [defendant] could prove which, if any, of his conversion projects were not corporate opportunities of Mimco. As far as plaintiffs were concerned, this group of projects formed one indistinguishable mass, and [defendant] had the burden of sorting them out." *Id.* at 766.

¶ 52　　　　Likewise, the monies that MPI owed Vital formed "one indistinguishable mass," which Sayeed had the burden of "sorting out" (*id.* at 766-67), since all the information regarding the subject transactions was within his control. Only Sayeed could prove how much, if any, of the monies that MPI owed Vital consisted of "valid charge[s]" instead of improper loans. Since he failed to do so, the trial court's calculation of damages was not against the manifest weight of the evidence.

¶ 53　　　　Sayeed's citation to *Tufo v. Tufo*, 2021 IL App (1st) 192521, is unavailing. In *Tufo*, we affirmed the trial court's finding that plaintiff "was unable to identify any lost profits or other damages stemming from defendant's breach of fiduciary duty." *Id.* ¶ 87. Although defendant took personal loans from the company, there was no evidence the loans were not repaid. *Id.* By

contrast, in the present case, Picker's testimony amply supports the trial court's finding that Vital's improper loans to entities owned by or affiliated with Sayeed were still outstanding. After reviewing the briefs, the appellate record, and the 1,922-page supplemental record containing exhibits (*e.g.*, Picker's report, tax returns, financial statements, agreements, appraisal, *et al.*), we do not find anything that would render the trial court's ruling arbitrary, unreasonable, or not based on the evidence. *Northwestern Memorial Hosp. v. Sharif*, 2014 IL App (1st) 133008, ¶ 25.

¶ 54                    4. Usurpation of Corporate Opportunity (Advanced)

¶ 55        Sayeed next argues the trial court erred in finding that his purchase of Advanced constituted usurpation of a corporate opportunity of Vital. In reviewing a judgment after a bench trial, we defer to the court's factual findings unless they are against the manifest weight of the evidence. *Staes & Scallan, P.C. v. Orlich*, 2012 IL App (1st) 112974, ¶ 35. We give great deference to the trial court's credibility determinations because the court is in the best position to evaluate the conduct and demeanor of the witnesses. *Id.*

¶ 56        "Individuals who control corporations owe a fiduciary duty to their corporations and their shareholders." *Anest v. Audino*, 332 Ill. App. 3d 468, 476 (2002). The corporate opportunity doctrine prohibits a corporation's fiduciary from taking personal advantage of business opportunities that are "reasonably incident to the corporation's present or prospective business and *** in which the corporation has the capacity to engage." (Internal quotation marks omitted.) *Advantage Marketing Group, Inc. v. Keane*, 2019 IL App (1st) 181126, ¶ 23. If a corporate fiduciary wants to take advantage of a business opportunity within the company's line of business, the fiduciary must first disclose and tender the opportunity to the corporation, even if the fiduciary believes that the corporation is legally or financially incapable of taking advantage

of the opportunity. *Anest*, 332 Ill. App. 3d at 478; see also *Kerrigan v. Unity Savings Ass'n*, 58 Ill. 2d 20, 28 (1974) (defendants' belief that corporation could not legally have engaged in business "cannot operate as a substitute for defendants' duty to present the question to [the corporation] for [the corporation]'s independent evaluation").

¶ 57    Here, the record reflects that Vital provided home healthcare services in Indiana prior to 2012. In 2012, Sayeed acquired Advanced, an Indiana company providing the same services as Vital, without first tendering the opportunity to Vital. The trial court found this to be a breach of Sayeed's fiduciary duty, a conclusion amply supported by the record. Sayeed nevertheless argues that his decision to buy Advanced was justified because it was "a high-risk acquisition" and Vital could not afford to shoulder the loss if Advanced went out of business. A fiduciary's belief that the corporation is financially incapable of taking advantage of a business opportunity does not absolve them of the duty to tender the opportunity to the corporation before seizing it for themselves. *Anest*, 332 Ill. App. 3d at 478. Moreover, Farooqi testified that "[t]he only reason that Vital did not attempt to set up a holding company to purchase Advanced was that it would have taken longer"—testimony which the trial court found to be more credible than Sayeed's in this regard. Consequently, the trial court's judgment for plaintiffs on their usurpation of corporate opportunity claim regarding Advanced was not against the manifest weight of the evidence.

¶ 58            5. Usurpation of Corporate Opportunity (Real Estate)

¶ 59    Sayeed argues (1) his purchase of the Real Estate did not constitute usurpation of Vital's corporate opportunity; (2) the trial court should have imposed a constructive trust upon the Real Estate instead of awarding monetary damages; and (3) the trial court's determination of damages is against the manifest weight of the evidence.

¶ 60    Sayeed first argues that his purchase of the Real Estate did not constitute usurpation of Vital's business opportunity since Vital was not in the real estate business and had no plans to expand into that business. However, a business opportunity must be tendered to the corporation as long as it is "reasonably incident" to the corporation's business. (Internal quotation marks omitted.) *Advantage Marketing Group*, 2019 IL App (1st) 181126, ¶ 23. Here, the trial court found that "owning an office would certainly be incidental to the operation of a home healthcare agency." This finding was supported by Sayeed's testimony at trial that, prior to the move, Vital needed a larger office that was "configured for [its] agency needs."

¶ 61    Sayeed next asserts that Vital did not have access to the necessary financing to purchase the Real Estate. Sayeed has forfeited this contention by failing to provide any record citations in support. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12 ("The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument.").

¶ 62    Sayeed further speculates that if the sellers of the Real Estate had been unwilling to deal with Vital, his purchase would not have constituted usurpation of a corporate opportunity. See *DiPace v. Figueroa*, 223 A.D.2d 949, 952, 637 N.Y.S.2d 222 (1996) (defendant's purchase of real estate was not usurpation of a corporate opportunity where the sellers "unequivocally aver[red]" that they would not have sold to the corporation, but only to defendant personally). *DiPace* is inapposite, since there is no testimony in this case as to whether the sellers would or would not have sold the property to Vital. Thus, the trial court's finding that Sayeed usurped Vital's corporate opportunity by purchasing the Real Estate was not against the manifest weight of the evidence.

¶ 63     Sayeed's second contention is that the trial court should have imposed a constructive trust upon the Real Estate instead of awarding monetary damages to plaintiffs. We disagree. "It lies within the equitable discretion of the trial court to determine the appropriate remedy for breach of a fiduciary duty." *Tully v. McLean*, 409 Ill. App. 3d 659, 681 (2011). When a fiduciary usurps a corporate opportunity, one remedy that may be awarded by the court is a constructive trust. That is, the trial court declares the fiduciary to be a "constructive" trustee of the property and orders him to transfer the property in question to the beneficiary of a judicially created trust. *Graham v. Mimms*, 111 Ill. App. 3d 751, 762 (1982).

¶ 64     Sayeed does not provide reasoning for his claim that the trial court abused its discretion in awarding monetary damages, aside from a vague and undeveloped assertion that a constructive trust would be a "reasonable" and "more just" remedy. He cites *Mile-O-Mo Fishing Club, Inc. v. Noble*, 62 Ill. App. 2d 50 (1965), but we do not see the applicability. In *Mile-O-Mo,* the plaintiff sought a constructive trust in its prayer for relief. Plaintiffs here did not. Also, the plaintiff corporation in *Mile-O-Mo* had been engaged in negotiations to purchase a certain parcel of real estate when the defendant, an officer of the corporation, purchased the parcel for himself. The plaintiff, therefore, sought to compel the defendant to convey the property to the corporation, and so the court did. But this does not mean the trial court abused its discretion in not imposing a constructive trust here, particularly where plaintiffs did not request one.

¶ 65     Sayeed's third contention is that the trial court's determination of damages is against the manifest weight of the evidence. In this regard, Sayeed asserts that the court failed to deduct the costs of acquisition of the property. On the contrary, the record reflects that the trial court subtracted "expenses including mortgage interest" in computing the net profits Sayeed obtained through his ownership of the Real Estate. The court also considered the initial purchase price of

the property in determining how much the property had appreciated since Sayeed's purchase. Thus, the trial court deducted the costs of acquisition from the judgment. Sayeed's argument lacks merit.

¶ 66     Sayeed additionally argues that the trial court should have granted him an offset because plaintiffs owned the building where Vital's offices were previously located. Although this argument is not clearly articulated, he appears to be arguing plaintiffs usurped Vital's corporate opportunity by purchasing that property and/or charging Vital rent to use that property.

¶ 67     This claim is not properly before us. Sayeed had ample opportunity to file this claim as a counterclaim or affirmative defense but failed to do so. In consequence, the record is not sufficiently developed for us to determine whether Sayeed would be entitled to any offset because of plaintiffs' actions, let alone what an offset should be. Accordingly, we find no error in the trial court's award of damages on this count.

¶ 68                                    III. CONCLUSION

¶ 69     For the foregoing reasons, we affirm the judgment of the trial court.

¶ 70     Affirmed.